UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Crim. No. 2:12-cr-702 (WJM) |
| Plaintiff, | |
| v. | **OPINION** |
| **RICHARD "BUZZY" DRESSEL,** | |
| Defendant. | |

On October 22, 2012, a grand jury returned an eight-count indictment charging Richard Dressel and John DeBouter with embezzlement and conspiracy to embezzle from a union and a union benefit plan. The case proceeded to trial on November 13, 2013. At the close of the Government's case, and then again at the close of his case, Dressel moved pursuant to Federal Rule of Criminal Procedure 29(a) for a judgment of acquittal on all counts. The Court reserved on both motions. A jury subsequently returned a verdict of not guilty on Counts 3-8 and a verdict of guilty on Counts 1-2. Dressel then renewed his Rule 29(a) motions on Counts 1 and 2. After reviewing written submissions from both parties, the Court heard oral argument on February 4, 2014. For the reasons set forth below, Dressel's Rule 29(a) motion is **GRANTED**.

## I. BACKGROUND

The International Brotherhood of Electrical Workers Local 164 (the "Local 164" or the "Union") has roughly 3,000 members. The Joint Apprentice Training Fund ("JATF") is a Taft-Hartley ERISA benefit plan with close ties to the Union. The JATF provides Union apprentices with a five year training program that includes classroom instruction and on-the-job training. During the relevant time period in this case, Richard Dressel and John DeBouter held positions in both the Union and the JATF. Dressel was the Union's Business Manager, and DeBouter

1

was the Union's President (a position below Business Manager). Dressel was also a JATF Trustee, and DeBouter was also the JATF Training Director.

On October 22, 2012, a federal grand jury returned an eight-count indictment against Dressel and DeBouter. ECF No. 1. The indictment revolved around salary payments that the Union and the JATF provided to Kathleen Libonati while Libonati was dating Dressel, and subsequently while Libonati was married to Dressel. The indictment can be broken down into two parts: Counts 1-3 and Counts 4-8.

Counts 4-8 concern the JATF. Count 5, brought under 18 U.S.C. § 664 and 18 U.S.C. § 2, charges that Dressel and DeBouter attempted to cover up Libonati's Union salary payments by taking JATF money and depositing it into a Union account. Counts 6-8, also brought under 18 U.S.C. § 664 and 18 U.S.C. § 2, charge that Dressel and DeBouter embezzled the salary payments made by the JATF to Libonati in 2010, 2011, and 2012. Finally, Count 4 charges conspiracy to embezzle from the JATF from March 1, 2010 through October 2012, in violation of 18 U.S.C. § 371. The jury returned a verdict of not guilty on Counts 4-8.

Counts 1-3 concern the Union. Count 1 is a conspiracy count, brought pursuant to 18 U.S.C. § 371. Count 1 charges that from January 2008 through March 2010, Dressel and DeBouter conspired to give Libonati an "unauthorized" Union job and pay Libonati a Union salary and benefits for "office staff duties which she failed to perform, and for which she provided no legitimate benefit to the union or its members." The jury returned a guilty verdict on Count 1.

Counts 2 and 3 are embezzlement counts, both brought under 29 U.S.C. § 501(c) ("Section 501(c)") and 18 U.S.C. § 2.[1] Essentially, the two counts differ only in the time period (March 2008-January 2009 or February 2009-February 2010). Both Count 2 and Count 3 charge that Libonati "performed no genuine service to Local 164 or its members" but was still provided with a Union salary

---

[1] Section 501(c) provides:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

and fringe benefit package. To convict Dressel on Counts 2 and 3, the Government had to prove beyond a reasonable doubt that Dressel took Union money with a fraudulent intent. *United States v. Welch*, 728 F.2d 1113, 1118 (8th Cir. 1984). Fraudulent intent "cannot be demonstrated solely upon proof of an objective criterion." *Id.* As such, the Government had to "demonstrate on the basis of all the evidence that [Dressel] acted knowing that [his] conduct was wrong under the circumstances." *Id.* The Third Circuit refers to this test as a "totality of the circumstances" test. *United States v. Oliva*, 46 F.3d 320, 324 (3d Cir. 1995).

To determine fraudulent intent based on the totality of the circumstances, no one factor is dispositive. So, for example, while a jury is free to consider whether the expenditure of union money actually benefited the union, s*ee United States v. Lore*, 430 F.3d 190, 202 (3d Cir. 2005) (citing *Oliva*, 46 F.3d at 324), the absence of a union benefit "is an inadequate basis on which the jury may find fraudulent intent." *Welch*, 728 F.2d at 1119 (internal citation and quotation omitted). Besides from a union benefit, a jury might also evaluate intent by considering whether the expenditure of union money paid for services that were actually rendered, *see United States v. Bane*, 583 F.2d 832 (6th Cir. 1978), whether the expenditure of union money was authorized, *see Lore*, 430 F.3d at 202, and whether the expenditure of union money was disclosed, *see United States v. Butler*, 954 F.2d 114 (2d Cir. 1992). In the instant case, the jury returned a guilty verdict on the first Section 501(c) charge, Count 2, yet it returned a not guilty verdict on the second Section 501(c) charge, Count 3.

## II.   EVIDENCE ADMITTED AT TRIAL

In this section, the Court reviews the evidence admitted at trial. The Court begins with the evidence admitted in the Government's case and then turns to the evidence admitted in Dressel's case.

### A.   The Government's Case

Twelve witnesses testified during the Government's case: David Milazzo (JATF Assistant Training Director and Instructor); Daniel Gumble (currently the Union's Business Manager); Daniel Solleder (JATF Instructor); Charles Mattson (formerly the Union's Treasurer); Michael Fitzmaurice (formerly a Union

apprentice); Darryl Parchment (Union member and former JATF Trustee); Donna McManus (formerly the JATF Office Manager); Robert Oliwa (Union accountant); Ernest Badaracco (JATF Trustee); Joan Farkas (Union Office Manager); Anthony D'Anna (JATF Trustee); and Denise Gerardi (Special Agent, United States Department of Labor, Office of the Inspector General). This section recounts the testimonial and documentary evidence presented in the Government's case.

### 1. The Union and the JATF

The Union's membership includes apprentices who train in the JATF apprenticeship program, graduates of the apprenticeship program known as journeymen, and office staff who support the activities of the Union and the JATF. Trial Transcript ("Tr."), Nov. 13, 2013, at 108:13-24. Among the latter group are "BA members," which include people who work in the Union office. *Id.* In 2008, BA member Joan Farkas, the Union's office manager, earned a salary of $111,670. Government's Exhibit 6. In 2008, office staff members Nancy Demarco, Joan Koehler, and Barbara Dolcemascolo received respective salaries of $65,600.00, $59,622.00, and $47,494.00. *Id.* All BA members receive the same benefits package, which was valued at roughly 50% of salary in 2008. Tr., Nov. 20, 2013, at 17:16-23, 107:17-23.

The Union has several elected officers who sit on an Executive Board (the "Executive Board"), which meets monthly to review Union expenditures. Tr., Nov. 13, 2013, at 67:23-68:4. These officers serve in a fiduciary capacity, meaning that they have an obligation to act in the best interests of the Union. Tr., Nov. 18, 2013, at 96:3-5. The Union is governed by the IBEW Constitution (the "Constitution") and by Local 164 Bylaws (the "Bylaws"). Tr., Nov. 13, 2013, at 111:7-15. Neither the Constitution nor the Bylaws prohibit the Union from entering into no-bid contracts, and neither the Constitution nor the Bylaws prohibit conflicts of interest when it comes to hiring. Tr., Nov. 18, 2013, at 7:16-21, 47:18-48:10. Indeed, the evidence established that nepotism was prevalent in the Union. *See, e.g.*, Tr., Nov. 13, 2013, at 75:19-25.

As noted earlier, the JATF is an ERISA benefit plan. Its annual budget runs between three and a half and four million dollars. Tr., Nov. 18, 2013, at 14:22-23. The JATF operates out of a multi-million dollar training facility located across the parking lot from the Union building. *Id.* at 16:8-9, 38:8-10. Apprentices are

4

enrolled in the JATF's apprenticeship program for a five-year period. Apprentices spend one day per week in the classroom and four days per week out in the field. *Id.* Regardless of whether they are in the classroom or in the field, apprentices are paid a salary and benefit package.

During the relevant time period, DeBouter served as the JATF's Training Director. Tr., Nov. 13, 2013, at 70:11-15. In that capacity, DeBouter ran JATF Board meetings but did not have a vote. As the Union's Business Manager, Dressel was automatically entitled to a seat on the JATF's Board. Both Dressel and DeBouter were fiduciaries for the JATF. *Id.* at 81:16-18.

    2.    Libonati Provides Services to the Union in 2008

        a.    Libonati Joins the Union

Kathy Libonati owns a catering company called Ship to Shore. In years prior to 2008, Ship to Shore catered a host of events for the Union. Tr., Nov. 18, 2013, at 6:13-16. In March 2008, Dressel hired Libonati as a salaried Union employee to provide in-house catering services. *Id.* at 224:25-225:12. At the time, Dressel and Libonati were dating (they would later marry). Nothing in the Government's case established that Dressel needed Executive Board approval to hire Libonati.[2] Similarly, nothing in the Government's case established that Libonati's hiring was concealed from the Union. Indeed, Libonati was sworn in as a Union member at an Executive Board meeting on July 17, 2008. *Id.* at 99:2-3; Government's Exhibit 20. Upon joining the Union, Libonati became a BA member, entitled to the same benefits package as other BA members of the Union. Tr., Nov. 20, 2013, at 107:14-23. In 2008, Libonati's base salary was $46,062. Government's Exhibit 6.

---

[2] Albert Kroll, a Union lawyer and a labor law authority who testified in Dressel's case, established that Dressel, as the Business Manager, had complete authority to make Union hires by himself. Tr., Nov. 21, 2013, at 219:10-18. The Government did not call any witnesses to rebut this evidence.

5

### b. The JATF Institutes the Lunch Program

During a March 4, 2008 meeting of the JATF Board of Trustees, DeBouter proposed a new initiative called the "Captive Lunch Program" (hereafter "the Lunch Program" or "the Program"). Government's Exhibit 56C. The Lunch Program would provide a free lunch for the apprentices on the days they were in class. At the time DeBouter made his proposal, apprentices paid for their own lunch, which they were free to bring to the JATF building or eat off-campus. Tr., Nov. 13, 2013, at 99:15-17. DeBouter told the Trustees that an in-house lunch program was warranted because apprentices were coming back from lunch drunk and late for class. Tr., Nov. 13, 2013, at 101:16-21. The testimony differed as to the necessity of the Lunch Program, *compare* Tr., Nov. 18, 2013, at 36:12-14, *with id.* at 219:18-20, but it was undisputed that the Lunch Program was ultimately implemented.

On March 4, 2008, the JATF Trustees "voted positively" on the Lunch Program pending information about cost. Government's Exhibit 56C. On April 8, 2008, while Libonati was already being paid as a salaried in-house caterer for the Union, DeBouter informed the JATF Trustees that the Lunch Program would cost $8 per person per day. Government's Exhibit 61. There was no evidence that DeBouter explained—or that anyone asked about—whether the $8 per person per day cost would cover just costs and expenses, or whether it would also pay for Libonati's labor.

On June 5, 2008, DeBouter told the Union membership about the Lunch Program. Government's Exhibit 19. The minutes from that meeting state: "lunch is served to students at the cost of $8 per student, keeps continuity and guest speakers will attend." *Id.*

### c. Libonati Caters the Lunch Program

The Government's own evidence at trial demonstrated that the Lunch Program authorized by the JATF Board was a real and substantial program that operated Monday through Thursday and served 25-45 apprentices per day. *E.g.*, Tr., Nov. 18, 2013, at 18:10-19:14. The evidence also demonstrated that the JATF invested in the Program: not long after Libonati was brought on as a Union employee, the JATF expended funds to renovate its kitchen in preparation for the

6

Lunch Program. Tr., Nov. 13, 2013, at 115:20-116:1. Milazzo testified that he observed Libonati cook and clean for the Program. *Id.* Libonati's menus, admitted into evidence, indicate that she prepared of variety of dishes for the apprentices, including barbeque chicken, pasta bolognese, sausage and peppers, and ribs. Government's Exhibit 70. Milazzo acknowledged that even when class was not in session, Libonati would come to work so she could prepare the kitchen, unload her car, and work on menus. Tr., Nov. 18, 2013, at 35:6-17. Mattson testified that Libonati would always come to work "very early," *id.* at 245:21-246:2, and Farkas testified that Libonati was "running for food and stuff on weekends and after hours," Tr., Nov. 20, 2013, at 23:11-13.

Though Milazzo thought the Lunch Program was unnecessary, it is clear that the Lunch Program provided a free lunch for Union apprentices. Tr., Nov. 19, 2013, at 223:4-6. Milazzo acknowledged that the Program shortened lunchtime from over one hour to 45-50 minutes. *Id.* at 22:14-22:6. Milazzo also testified that tardiness was a problem before the Lunch Program, but it was not a problem after the Lunch Program began. *Id.* Like Milazzo, Solleder confirmed that the Lunch Program cut down lunchtime to roughly 45 minutes and prevented tardiness. Tr., Nov. 18, 2013, at 190:17-25.

The evidence admitted in the Government's case indicated that the Lunch Program's expenses—as opposed to Libonati's personal labor cost—were covered by checks the JATF would write to Libonati's company, Ship to Shore. Before Libonati prepared and served lunches, the JATF would provide an advance to Ship to Shore. Before making the advance, JATF Office staff would confirm the number of students Libonati would need to feed. Tr., Nov. 19, 2013, at 130:22-131:7. The total advance would be calculated by multiplying the number of students per class by the number of class days, and then multiplying that number by $8. *Id.* at 91:2-7. After receiving an advance, Ship to Shore would submit an invoice reflecting supply costs as well as a labor cost for Maria, a woman who helped Libonati with the lunches. *Id.* at 98:4-6. Ship to Shore's invoices would be accompanied by receipts, *id.* at 133:17-19, from stores like Restaurant Depot, BJs, and A&P supermarket. *See* Government's Exhibit 74A. JATF Office Manager Donna McManus testified that if Libonati ran a bit over the $8 per person per day, the JATF would provide a reimbursement for the additional cost, and if Ship to Shore spent less than the advance, the JATF would receive a check for the unspent amount. Tr., Nov. 19, 2013, at 134:3-16. Finally, McManus testified that

disbursements made to Libonati were disclosed to the JATF Trustees for their review. *Id.* at 125:24-126:23.

### d. Libonati Caters Additional Events

The Government's evidence also demonstrated that besides the Lunch Program, which was the focus of the Government's case, Libonati provided other services by catering various and multiple events in 2008. Gumble testified that when Libonati joined the Union, Libonati took over an outreach program at Hackensack University Medical Center, Tr,. Nov. 18, 2013, at 142:2-7, which was a monthly event that involved shopping and then bringing gifts to children in the hospital wards, Tr., Nov. 20, 2013, at 118:1-16. Libonati also catered a retiree lunch, labor walks, and the Union Christmas party, as well as the apprentice orientation and graduation. Government Exhibits 74B, 74C, 83A. Libonati also provided catering services for two "annuity dinners," paid for by Morgan Stanley, Tr., Nov. 20, 2013, at 83:10-14, 116:20-23, where representatives from Morgan Stanley would come to discuss annuities. In addition, Libonati catered the Graybar trade show, a 1000 person event that lasted two days in May 2008, get-out-the-vote events, and election walks. Government's Exhibit 16B; Tr., Nov. 20, 2013, at 116:16-117:1. Farkas testified that when it came to all of these events, Libonati was provided with advances to cover costs, not additional salary on top of what Libonati was already being paid. Tr., Nov. 20, 2013, at 82:9-14. Testimony in the Government's case indicated that the Union's Executive Board reviewed and approved the advances that were provided to Libonati. Tr., Nov. 18, 2013, at 201:15-22.

### e. Libonati's Union Salary is Disclosed

Libonati's W-2 established that her Union salary was $46,062.40 in 2008. Government's Exhibit 21. The Union disclosed Libonati's salary in its 2008 LM-2 form, a publically available report that Unions are required to file. Government's Exhibit 6.

B.     **Dressel's Case**

During his case, Dressel presented the testimony of four witnesses: Philip Chianetta (JATF Trustee); Bruce Pendy (employee of the Union and the JATF); Libonati; and Albert Kroll (outside counsel to the Union and the JATF).

One of the issues that went unexplored in the Government's case was whether Union rules gave Dressel authority to bring Libonati onto the Union staff without Executive Board approval. Union and JATF Attorney Albert Kroll testified that Dressel did, in fact, have such authority. Tr., Nov. 21, 2013, at 219:10-18. Kroll further testified that there was no Union rule against hiring family members. *Id.* at 220:19-25.

Kathy Libonati testified that she became a Union member in March 2008, years after she began working as an outside caterer for Union events. *Id.* at 117:3-7. Libonati explained that once she was hired in March, she kept busy with Union work until the Lunch Program began in May. *Id.* at 126:10-21; 133:8-134:4. Libonati testified that she went to work every day from March through May so she could prepare the two-day Graybar trade show, get the kitchen ready, shop for supplies, and decide on menus for the Lunch Program. *Id.* at 133:8-134:4.

Much of Libonati's testimony focused on how she was paid by the Union and the JATF. To begin with, Libonati testified that the Lunch Program's $8 per person per day allocation was only meant to cover expenses, not salary. *Id.* at 131:6-15. This testimony was corroborated by JATF Trustee Chianetta, who explained that when the Lunch Program was instituted, he understood that the $8 per person per day charge would only cover expenses, separate and apart from a salary for Libonati. *Id.* at 65:16-66:6. Libonati testified that the Lunch Program was "a wash" because she would refund any money left over from the advances. *Id.* at 131:6-15, 201:7-11. Libonati testified that besides from her Union salary, she only profited when the JATF's space was used by outside entities like the plumbers' union. *Id.* at 125:22-126:6.

Libonati also testified about the way in which she would submit her receipts. She said that she would take receipts and attach them to an 8 ½ x 11 page, which she would feed through a scanner. *Id.* at 148:15-149:3. She said that some of the receipts would get cut off because they were too big for the paper. *Id.*

Libonati rejected any hint that her job was a no-show job. Libonati testified that in addition to her work with the Lunch Program, she worked on a host of

Union events including annuity dinners, retiree dinners, the Hackensack Hospital outreach program, get-out-the-vote events, and labor walks. *Id.* at 127:21-129:18. Libonati testified that she would shop before work, on her way home, and on the weekends. *Id.* at 152:11-153:6. She said that she worked even when there was no class in session. *Id.* at *Id.* at 155:3-11. Bruce Pendy, who helped Libonati with catering duties, testified that Libonati would often get to work before 6:45 a.m. *Id.* at 106:19-21.

No rebuttal evidence was presented by the Government.

### III. LEGAL STANDARD

Federal Rule of Criminal Procedure 29(a) provides:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

Federal Rule of Criminal Procedure 29(b) allows judges to reserve decision on a Rule 29(a) motion filed at the end of the Government's case and then decide the motion after the verdict is rendered. "If the court reserves decision [on a Rule 29 motion], it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

A defendant bears a significant burden on a Rule 29 motion. In considering a Rule 29 motion, the Court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt." *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (internal quotations and citations omitted). Put slightly differently, the Court "must sustain a verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003) (internal quotations and citations omitted). This substantial evidence can be circumstantial evidence; it need not be direct evidence. *Id.* It follows that a finding of insufficiency should be reserved for those situations in which "the prosecution's failure is clear." *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010). In

considering a Rule 29 motion, the Court refrains from "weighing credibility and assigning weight to the evidence." *Id.* (internal quotations and citations omitted).

## IV. RULE 29 MOTIONS

As noted earlier, Dressel moved for a judgment of acquittal based on the evidence admitted during the Government's case, and Dressel also moved for a judgment of acquittal on the basis of the evidence admitted during the entire trial. Because the jury acquitted Dressel on Counts 3-8, Dressel's motions remain only as to Counts 1 and 2.

### A. Motion for Judgment of Acquittal Made at the End of the Government's Case

#### 1. Count 2

In considering whether to grant Dressel's motion for a judgment of acquittal on Count 2, the Court has "review[ed] the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Boria*, 592 F.3d at 480. The Court has conducted this review without "weighing credibility and assigning weight to the evidence." *Id.* The Court finds that no rational jury could conclude that the Government met its burden to prove beyond a reasonable doubt that Dressel acted with the fraudulent intent necessary to sustain a conviction on Count 2.

As discussed earlier, in considering whether the Government met its burden on Count 2, a jury would have to decide whether the Government offered substantial evidence that proved beyond a reasonable doubt that Dressel acted with fraudulent intent. Under the totality of the circumstances test, a jury might evaluate fraudulent intent by considering, among other things, whether the expenditure of union money provided the Union with actual services and a genuine benefit, and whether the expenditure of union money was authorized and disclosed. Because the Government emphasizes genuine services and genuine benefits, the Court begins with those factors.

The indictment charges that Libonati provided the Union with no "genuine services" and no "legitimate benefit"—essentially that Libonati had a low-show or

11

a no-show job. The Government's evidence does not support this charge. On the contrary, the Government's own evidence established that Libonati was hired as the Union's in-house caterer, and that Libonati performed a variety of catering jobs for the Union. Tr., Nov. 18, 2013, at 224:25-225:12. Indeed, Government witnesses testified that Libonati catered the Lunch Program, which provided a free lunch and reduced tardiness. Tr., Nov. 18, 2013 at 22:14-22:6, 190:17-25. As such, the Government's witnesses directly contradicted the Government's "no legitimate benefit" and "no genuine services" theories. Also contradicting the Government's "no legitimate benefit" and "no genuine services" theories was the unrebutted testimony of Government witnesses establishing that Libonati catered the two-day Graybar tradeshow which brought 1000 people to the Union campus, that Libonati ran the monthly Hackensack Hospital outreach program, and that Libonati catered annuity dinners, the apprentice orientation and graduation, retiree lunches, the Union holiday party, get-out-the-vote events, and election walks. *See* Tr,. Nov. 18, 2013, at 142:2-7; Tr., Nov. 20, 2013, at 83:10-14, 116:16:117:1; Government Exhibits 16B, 74B, 74C, 83A.

   Having failed to establish that no "genuine services" were rendered, the Government next attempts to argue that Libonati was overpaid for her in-house catering services. But the Government offered no evidence indicating what an in-house caterer's services were worth. Accordingly, the jury could only speculate about whether Libonati's salary was reasonable. Notably, to the extent the Government offered any evidence about the reasonableness of Libonati's salary, that evidence established that Libonati's salary was in line with other BA members of the Union, and that Libonati received the same benefits as other BA members.

   Next, the Government contends that fraudulent intent was established based on Libonati's alleged double dipping. To begin with, the Government argues that Libonati was being paid twice for the same Lunch Program: once by the Union and once by the JATF. The Government's evidence did not support this theory. Rather, the evidence established that expenses for the Lunch Program were paid by the JATF, and that Libonati provided receipts for those expenses. The evidence also established that while she was catering the Lunch Program, Libonati was receiving a Union salary as her compensation for her services for the Lunch Program and other Union catering functions. It would be completely illogical to think that the JATF's $8 per person per day allocation—which was advanced to Libonati, funded a genuine lunch program, and backed up by receipts—was

12

somehow ending up in Libonati's pocket. Indeed, if Libonati was pocketing the money for the Lunch Program, what was paying for the cost of food and expenses for the apprentices' meals?

Next, the Government argues that Libonati was double dipping because she was pocketing advances she received to cater various events. While there were some minor discrepancies in Libonati's invoices, the overwhelming evidence established that Libonati submitted invoices with receipts for the events she catered. *See* Tr., Nov. 19, 2013, at 130:22-131:7; *see also* Government's Exhibit 74A. There was insufficient evidence that the receipts were fraudulent or that any of the advances went into Libonati's pocket. Moreover, the evidence established that Libonati's invoices were reviewed by the JATF Trustees. There is no evidence that the JATF Trustees challenged Libonati's invoices.

Next, the Government argues that Libonati could not have spent all of her advances on Union events, as evidenced by the fact that Libonati made only a few reimbursements to the Union or the JATF. But that assumes there was money left over after the advances were gone, and that is something the Government never proved. The Government also argues that Libonati embezzled from the Union because she was on a Union salary when she catered some events for the JATF. The JATF and the Union had close and obvious ties; no rational jury could find that Dressel acted with fraudulent intent when he put Libonati in a catering role that served both the Union and the JATF.

In determining whether the Government established fraudulent intent, a rational jury might also consider whether Libonati's Union hiring was authorized by the Union and disclosed to the Union. The Government charged that Libonati's hiring was "unauthorized," but it offered no evidence supporting that charge. On the contrary, the evidence established that Libonati was sworn into the Union membership at a Union Executive Board meeting. As for disclosure, Libonati's catering expenses were disclosed to the Executive Board. Moreover, Libonati's salary was published in the Union's publically available LM-2 forms. And while the Government contends that nepotism played a role in Libonati's hiring, the Government's evidence established that nepotism was commonplace in the Union, and that there was no Union policy against nepotism. Additionally, the Government's evidence established that when she was hired, Libonati had been the Union's outside caterer for years, and that she was a proven entity.

Having considered all the evidence in the light most favorable to the Government, the Court finds that no rational jury could conclude that the Government met its burden to establish that genuine services were not rendered and that Dressel acted with fraudulent intent beyond a reasonable doubt.  The Court will **GRANT** Dressel's motion for a judgment of acquittal on Count 2.

Before concluding this section, a few words are in order about Count 3.  Like Count 2, Count 3 was brought under Section 501(c).  Unlike Count 2, the jury returned a not guilty verdict on Count 3.  The Court well understands that juries can reach different verdicts on different counts.  But as previously stated, Counts 2 and 3 were virtually the same except for the time period charged, and the same burden of proving fraudulent intent applied to both counts.  While the Court's task on Dressel's Rule 29 motion is to evaluate whether substantial evidence, construed in the light most favorable to the Government, could support a conviction on Count 2, the Court has endeavored to discern the differing evidence, if any, that justified the different verdicts on Counts 2 and 3.  The Government suggests that the differing evidence has to do with the timeframe from March 2008 through May 2008.  The Government implies that since the Lunch Program did not commence until May 2008 and Libonati was hired by the Union in March 2008, there were no genuine services rendered by Libonati during this approximate two month period.  Tr., Nov. 21, 2013, at 19:4-6.  This argument is without merit.  It would be illogical to conclude that there would be no preparation required for launching the Lunch Program.  Obviously, time and effort would have had to be devoted to such preparation in the two brief months before the Program began.  Moreover, the Government's evidence established that during this time period, Libonati catered the May 2008 Graybar event.  No rational juror could conclude that Libonati catered such a substantial event without significant preparation.  (Indeed, Libonati's unrebutted testimony confirmed that she was doing a host of things for the Union, including preparing for the Graybar event, in March 2008-May 2008).  Ultimately, the Court is unable to discern any difference in the evidence that would have led a rational jury to convict on Count 2 and acquit on Count 3.

    2.    Count 1

To convict Dressel on Count 1, the Government had to prove four elements beyond a reasonable doubt: "(1) an agreement to commit an offense proscribed by

federal law; (2) the defendants intentionally joining in the agreement; (3) one of the conspirators committing an overt act; and (4) an overt act in furtherance of the conspiracy." *U.S. v. Rigas*, 605 F.3d 194, 206 n.9 (3d Cir. 2010). To be found guilty of a conspiracy, there must be a substantive crime which the parties agreed to commit. Counts 2 and 3 set forth the substantive crimes that are the underpinnings of the alleged conspiracy here. This Court has granted a Rule 29 motion on Count 2, concluding that no rational jury could have found Dressel guilty on that count. In returning a verdict of not guilty on Count 3, the jury found that the Government fell short of meeting its burden on Count 3, and this Court finds that no rational jury could have concluded otherwise on Count 3. It therefore follows that since there is no substantive crime here, Dressel could not agree to commit a substantive crime, and there can be no conspiracy conviction. Accordingly, the Court finds that the Government failed to present evidence from which a rational jury could have convicted Dressel of a conspiracy under Count 1. Accordingly, the Court will **GRANT** Dressel's motion for a judgment of acquittal on Count 1.

### B. Motion for Judgment of Acquittal Made at the End of Dressel's Case

While the Court will grant the motion for judgment of acquittal on the basis of the Government's case, the Court wishes to add a few words about the evidence put forward in Dressel's case. Perhaps the most important testimony in Dressel's case was that of attorney Albert Kroll, an authority on union law, who testified that Dressel had complete authority to hire Union staff without input from the Union Executive Board. Other important testimony was provided by Libonati, who echoed testimony in the Government's case that Libonati worked hard for the Union and provided the Union with a genuine benefit. Libonati's testimony also explained why her receipts were sometimes cut off. Furthermore, Libonati's testimony established that while she did not begin serving lunches until May 2008, two months after she was hired in March 2008, Libonati spent the intervening time period preparing the Lunch Program, setting up the kitchen, shopping for supplies, and getting ready for the 2 day, 1000 person Graybar tradeshow in May. Indeed, it is difficult to imagine how Libonati could have put together the Program and the Graybar event without doing the necessary preparation in March and April.

Libonati's testimony that she performed genuine services—testimony that was corroborated by the Government's own witnesses—was unrebutted. If Libonati was lying about the work she performed for the Union, it would have been a simple matter for the Government to discredit her testimony. The Government would have needed only to call rebuttal witnesses from the Union, from Morgan Stanley, or from Hackensack Hospital to testify that Libonati did not provide the services she testified about. Tellingly, the Government did not call a single rebuttal witness. When considered alongside the evidence admitted in the Government's case, the evidence admitted in Dressel's case would lead the Court to grant a motion for a judgment of acquittal on Counts 1 and 2.

## V. CONCLUSION

For the reasons set forth above, Dressel's Rule 29 motion for a judgment of acquittal on Counts 1 and 2 based on the evidence put forward at the end of the Government's case is **GRANTED**. An appropriate order follows.

                                                  /s/ William J. Martini  
                                               **WILLIAM J. MARTINI, U.S.D.J.**

**Date: April 10, 2014**